**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHEN PALISH, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No.:   13-cv-4092 |
| | : | |
| K&K RX SERVICES, L.P., et al., | : | |
| Defendants. | : | |

**M E M O R A N D U M**

SITARSKI, M.J.                                                                          June 12, 2014

Currently pending before the Court is a motion for summary judgment filed by

Defendants K&K RX Services, L.P. and Steven Seiden.  For the following reasons, the motion

will **GRANTED in Part and DENIED in Part.**

## I.      INTRODUCTION

Plaintiff filed his Complaint on July 15, 2013, against K&K RX Services L.P. d/b/a

Elwyn Pharmacy.  (Doc. No. 1).  This matter initially was assigned to District Court Judge Juan

R. Sanchez.  On October 4, 2013, the parties consented to the exercise of jurisdiction by a United

States Magistrate Judge under 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, and the matter was referred

to me.  (Doc. No. 13).

On February 12, 2014, Plaintiff filed a Second Amended Complaint against K&K and

Steven Seiden ("Dr. Seiden"), alleging violations of the Americans with Disabilities Act, as

amended ("ADAAA"), 42 U.S.C. §§ 12101 *et. seq.*;[1] the Age Discrimination in Employment Act

---

[1]  The ADA Amendments Act ("ADAAA") of 2008 took effect on January 1, 2009.  *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat, 3553 (2008).  The parties do not dispute that the ADAAA applies to Plaintiff's claims.

("ADEA"), 29 U.S.C. §§ 621 *et. seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43

P.S. §§ 951 *et. seq.* ("PHRA").  (Doc. No. 33).  On February 28, 2014, Defendants filed an

Answer.

On April 14, 2014, following completion of discovery, Defendants filed the instant

Motion for Summary Judgment.[2]  (Doc. No. 37).  On May 5, 2014, Plaintiff filed a Response and

Statement of Facts.[3]  (Doc. No. 39).  On May 15, 2014, Defendants filed a Reply.  (Doc. No. 42).

Accordingly, the matter is now ripe for disposition.


II.     **FACTUAL BACKGROUND**[4]

A.      **The Parties**

Plaintiff is a licensed Pharmacist who has more than twenty-five years of pharmaceutical

experience.  (PSOF ¶ 5).  He is licensed to practice in Pennsylvania, New Jersey, and Florida,

and has worked as a retail pharmacist, hospital pharmacist and consultant pharmacist.  (PSOF ¶

4, 6).  For more than ten years, Plaintiff has suffered from Spondylolisthesis, Degenerative Disc

Disease, and Retrolisthesis, all of which affect the vertebrae of his back.  (PSOF ¶ 8).  On

December 5, 2005, Plaintiff underwent spinal fusion surgery.  Plaintiff testified that he has since

been able to lead an active lifestyle; he goes to the gym twice a week, bikes once a week during

_____

[2]  Defendants' Motion contains a request for oral argument.  However, upon review of
the parties' briefs, I conclude that argument is unnecessary and shall decide Defendants' Motion
solely on the papers, pursuant to Federal Rule of Civil Procedure 78.

[3]  Defendants did not file a Statement of Undisputed Material Facts ("DSOF") in
numbered paragraphs.  Plaintiff's Statement of Facts contains numbered paragraphs and attempts
to respond directly to Defendants's facts.  (*See* Doc. No. 39-1, Pl. Statement of Facts ("PSOF")).

[4]  The following facts are either undisputed, or are taken in the light most favorable to
Plaintiff, the non-moving party.

the summer, and swims occasionally.  (Palish Dep. at 17-18).  However, he contends that back

pain still results in certain limitations in his ability to do work-related activities, namely his

ability to stand.  (PSOF ¶ 16).

Defendant K&K Rx Services, L.P. is a limited liability company established in 2003.  In

2003, K&K acquired a retail pharmacy ("Elwyn Pharmacy" or "Elwyn") in Media,

Pennsylvania.  Elwyn Pharmacy is owned and managed by James Karalis, Nicholas Karalis, and

Joseph Giorno.  (DSOF at 4).  Elwyn provides a variety of services, including on-site

prescription filling, delivery of prescriptions to long-term-care facilities, vaccination services,

and the sale and fitting of durable medical equipment.  (*Id.*).  They employ around fifteen to

twenty-five individuals.  The store is supervised by the Pharmacy Manager, who supervises the

employees and is responsible for day to day operations.  (*Id.*).

**B.      Plaintiff's Hiring at Elwyn Pharmacy**

From 2008 through 2012, Defendant Dr. Stephen Seiden ("Dr. Seiden") was the

Pharmacy Manager at Elwyn.  Some time in 2012, the managers promoted Dr. Seiden to Director

of Pharmacy Operations.  (*Id.*).  As a result, the Pharmacy Manager position at Elwyn Pharmacy

was open.

Dr. Seiden and the managers worked together to fill the open position, and eventually

identified two candidates: Jennifer Podberesky and Plaintiff.[5]  (*Id.* at 7).  Both candidates

interviewed with Dr. Seiden and James Karalis (an owner and partner).  Plaintiff did not disclose

that he was suffering from a medical condition during his interview.  (PSOF ¶¶ 24, 25).

On September 10, 2012, Defendants extended an offer of employment to Plaintiff.  (*Id.* ¶

_____

[5]  Ms. Podberesky was "notably younger" than Plaintiff.  (DSOF at 7).

26).  Plaintiff accepted the position, and began work on September 27, 2012.  (*Id.* ¶ 28).  As the

Pharmacy Manager, Plaintiff reported directly to Dr. Seiden.  Plaintiff's duties were to include

supervising employees, ensuring that all prescriptions were accurately filled, providing

information on medications and their proper indications, and maintaining records.  (Pl. Ex. K,

"Responsibilities of Pharmacy Manager"; *see also* Palish Dep. at 95).

     On his first day of work, Plaintiff informed Dr. Seiden of his back issues and asked that

he be allowed to sit occasionally.  (Palish Dep. at 98).  After considering Plaintiff's request, Dr.

Seiden told him that could not provide him with a stool or let him sit because then he would have

to allow all the other employees to sit.[6]  (*Id.* at 109-110).  Despite this, Plaintiff testified that he

was able to do his job, albeit with pain.  (*Id.* at 125-26).

     For the first week of his employment, Plaintiff shadowed Dr. Seiden.  (Seiden Dep. at 57-

58).  Plaintiff testified that Elwyn Pharmacy was significantly busier than his previous position,

noting that they filled as many prescriptions in one day as he filled in a week at his previous job.

(Palish Dep. at 25).

## C.  Plaintiff's Performance Problems and Termination

     According to Defendants, there were several issues with Plaintiff's job performance

almost from the outset of his employment.   Specifically, Plaintiff had issues finding certain

_____

    [6] Defendants dispute the fact that Plaintiff did not receive a sitting accommodation.  In
support, they point to Dr. Seiden's testimony that he told Plaintiff he was free to sit throughout
the day, but that he could not provide Plaintiff a stool to sit behind the pharmacy counter because
it would create a tripping hazard.  (DSOF at 9).  Dr. Seiden testified that he told Plaintiff that if
he had to sit the <u>entire</u> day, it might be an issue because he was the manager.  (Seiden Dep. at
159).  Plaintiff has admitted that he did not need to sit the entire day.  Dr. Seiden also denied that
he told Plaintiff that if he needed to sit during the day then the job would not work out for him.
This Court will credit Plaintiff's version of events, given that he is the non-moving party.

medications and had poor knowledge of the brand versus generic substitute.[7] (Seiden Dep. at 95; 111). By way of example, Donna McHale (a pharmacy technician) testified that Plaintiff did not know the brand name CRESTOR, which a pharmacist with Plaintiff's experience should know.

Plaintiff also was unable to secure his subordinates' confidence; the staff complained that they were generally "uncomfortable" working with Plaintiff because he was awkward, did not have the knowledge needed to manage, and did not act with the authority of a manager. (*See* McHale Dep. at 21).

On or around October 4, 2012, Dr. Palish was being trained by Ms. McHale. Upon seeing a the doctor's name that was listed on a prescription, Plaintiff made an offensive comment concerning the female anatomy.[8] (McHale Dep. at 29). Ms. McHale reported the incident to one of the managers, who proceeded to document it. (Def. Appx. at 17 ("Record of Verbal Warning")).

In response to the growing number of employee complaints, Dr. Seiden held a team meeting – without Plaintiff – towards the end of his second week of employment. (Seiden Dep. at 135). At the meeting, several members of the pharmacy team relayed their concerns about working with Plaintiff. Specifically, Pharmacy technician Amy Nail expressed her concern that Plaintiff was seeking her assistance in knowing the brand names of medication when she had no training in the area. (*Id.* at 98). Another employee, Mr. Anthony Viscuso stated that he did not

---

[7] Plaintiff does not dispute that he did not know the brand names of certain drugs. (Palish Dep. at 167). He contends that his lack of knowledge of brand names was due to the fact that his prior pharmacy's medication storage system stocked drugs by their generic name, while Elwyn's storage system was based on the brand name. (Palish Dep. at 134; McHale Dep. at 267).

[8] Plaintiff does not recall this conversation with Ms. McHale. (Palish Dep. at 161).

feel comfortable leaving Plaintiff with customers because of his general lack of pharmaceutical knowledge.  (*Id.* at 100).

Thereafter, Dr. Seiden relayed his concerns about Plaintiff's lack of management and leadership abilities to Dr. Giorno (one of the owners), and sought his assistance in helping Plaintiff improve.  (Giorno Dep. at 19).  They ultimately decided to put together an "action plan" that Plaintiff could use as a guide to improve his performance.  (*Id.* at 24. Seiden Dep. at 114). Owner James Karalis testified that the action plan was not considered a disciplinary action, but "it's saying that you're not meeting the requirements of the job, this is what we need you to do. It's an attempt to be proactive to get the employee to meet the requirements that we want."  (J. Karalis Dep. at 32).  The "action plan" was structured as a "timeline," setting forth deadlines for Plaintiff to improve in specific subject areas, such as: product knowledge, the work flow system, the HBS,[9] and how to order inventory.  (Def. Appx. 17 ("Stephen Palish Timeline and Expectations")).

On October 8, 2012, Dr. Seiden met with Plaintiff and told him that his product knowledge was not sufficient and that other employees had expressed concerns over Plaintiff's abilities.  (Seiden Dep. at 121-22).  Dr. Seiden also went over the action plan with Plaintiff, who was receptive to the idea.  (Seiden Dep. at 113, 143-45).

The next day, Dr. Seiden was out of the pharmacy at a flu clinic.  (Seiden Dep. at 131). He received a call from Anthony Viscuso, who had to leave the pharmacy because of an illness. (*Id.*).  Because he did not feel comfortable having Plaintiff at the pharmacy by himself, Dr.

---

[9]  The HBS was the pharmacy's software, utilized to search for a patient's history, understand how many refills are left, refill a prescription itself, and enter insurance information. (Seiden Dep. at 123).

6

Seiden had Plaintiff come to the flu clinic to vaccinate people so Dr. Seiden could handle matters at the pharmacy. (*Id.* at 131-32). According to Dr. Seiden, Plaintiff failed to show any initiative in helping Dr. Seiden vaccinate the patients who were waiting in line. After Dr. Seiden finished vaccinating the people in line, he then had to instruct Plaintiff on how to administer the vaccines and what documentation would be needed, despite the fact Plaintiff should have already been proficient in these areas as a licensed vaccinator. (*Id.* at 133).

That evening, Dr. Seiden had a conference call with all the managers about Plaintiff's performance issues. (*Id.* at 138). Dr. Seiden relayed the concerns that his staff had about Dr. Seiden's performance and managerial abilities. (*Id.* at 139). Ultimately, the decision was made to terminate Plaintiff.[10]

Three days later, on October 12, 2012, Dr. Seiden and James Karalis met with Plaintiff and terminated his employment. Plaintiff testified that Dr. Seiden told him "[w]ell you're just not – you're not a good fit. But it's not your fault. It's my fault. I should have hired somebody younger and more energetic."[11] (Palish Dep. At 185). Dr. Seiden testified that he informed Plaintiff he was being terminated primarily because of his poor leadership skills.[12] (Seiden Dep.

---

[10] Whether Dr. Seiden was one of the "decisionmakers" is in dispute. However, it is not disputed that Dr. Seiden was involved in the conversation that led to Plaintiff's termination. (*See* Seiden Dep. at 139).

[11] Plaintiff's own recollection of the termination meeting is the only evidence that Dr. Seiden told Plaintiff that he should have hired somebody younger. Dr. Seiden and James Karalis – who were both at the termination meeting – denied that Dr. Seiden made the statement. (Seiden Dep. at 170; J. Karalis Dep. at 40).

[12] Dr. Seiden also cited to Plaintiff's poor product knowledge and inability to become familiar with Elwyn's systems. However, Dr. Seiden admitted that he was partly to blame for the poor training, but reiterated that Plaintiff was being fired primarily because of his lack of leadership skills. (Seiden Dep. at 168).

7

at 167).

On October 26, 2012, Elwyn Pharmacy hired Lauren Samar as their new Pharmacy Manager.  (Pl. Ex. O).  Ms. Samar was 31 years old at the time she was hired.  (PSOF ¶ 100).

## III.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party.  *Id.*  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) *(citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  The non-

moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.


## IV.   ADAAA Claims

Plaintiff brings three claims under the ADAAA: (1) failure to accommodate ("Claim 1"); (2) disparate treatment (i.e. discriminatory termination on the basis of a disability) ("Claim 2"); and (3) retaliation for requesting a reasonable accommodation ("Claim 3").[13]  Plaintiff's failure to accommodate claim (Claim 1) is the only claim that is not analyzed pursuant to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[14]

---

[13]  Plaintiff also brings claims under Pennsylvania Human Relations Act, 43 § 951, et seq. Unless otherwise noted, this Court's analysis of Plaintiff's ADAAA claims will apply equally to the PHRA claims. *See Castellani v. Bucks Cnty. Municipality*, 351 F. App'x 774, 777 (3d Cir. 2009).

[14]  Claims 1 and 2 – failure to make a reasonable accommodation and disparate treatment – both fall within the definition of "discrimination" under the statute, 42 U.S.C.S. § 12112(a), (b). However, the two are distinct claims and only the disparate treatment claim (Claim 2) is analyzed pursuant to the burden-shifting framework. *See Stadtmiller v. UPMC Health Plan, Inc.*, 799 F. Supp. 2d 492, at *504 n.11 (W.D. Pa. 2011) ("Failure to accommodate claims are distinct from claims of disparate treatment, and are differently analyzed.").

*See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).   I will first address Claim 1, and then

analyze Claims 2 and 3 together pursuant to the *McDonnell Douglas* burden shifting framework.

### A.       Claim 1: Denial of Reasonable Accommodation in Violation of the ADAAA

The ADAAA prohibits an employer from failing to provide "a reasonable

accommodation to the known physical or mental limitations of an otherwise qualified individual

with a disability."  42 U.S.C. § 12112(b)(5)(A).  "In order to establish a prima facie case for

failure to accommodate, [the plaintiff] must show that: (1) he had a disability; (2) the employer

had notice of this disability; (3) he can perform the essential functions of his position with a

reasonable accommodation; and (4) the employer failed to provide an accommodation." *Boice v.*

*SEPTA*, No. 05-4772, 2007 U.S. Dist. LEXIS 74566, at *41 (E.D. Pa. Oct. 5, 2007) (internal

citations omitted).

### 1.       Prong 1-Disability

A person is disabled under the ADAAA if they: (1) have a physical or mental impairment

that substantially limits one or more major life activities; (2) have a record of such impairment;

or (3) are regarded as having such impairment.  42 U.S.C. § 12102(2).  For purposes of the

instant claim, only the first definition of disability is relevant.[15]

Plaintiff argues that he is actually disabled because he "has a physical or mental

_____

[15]  Plaintiff has put forth no evidence that constitutes a "record" of an impairment, and, under the ADAAA, a failure to accommodate claim is no longer available for individuals who qualify as disabled solely under the "regarded as" prong of the definition.  42 U.S.C. § 12201(h); *Szarawara v. County of Montgomery*, No. 12-5714, 2013 U.S. Dist. LEXIS 90386, at * 15 (E.D. Pa. June 27, 2013) (a failure to provide a reasonable accommodation to an individual who is disabled solely under the "regarded as" prong is not a cognizable claim under the ADAAA). Thus, whether there exists a genuine issue of fact as to whether Plaintiff is actually disabled is the only relevant issue for purposes of Claim 1.

impairment that substantially limits one or more major life activities."  The regulations accompanying the ADAAA define  "major life activities" as "those basic life activities that the average person in the general population can perform with little or no difficulty."  29 C.F.R. § 1630.2(i).  Examples of major life activities include: caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  *Id.*  An impairment is defined as "'[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."  29 C.F.R.  § 1630.2(h)(1).  "Substantially limited" means that an individual is either: (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which he or she performs the activity as compared to the condition, manner or duration under which the average person in the general population performs the activity.  29 C.F.R. § 1630.2(j)(1).  "Ultimately, whether an individual is substantially limited as to a major life activity is a question of fact."  *Eastman v. Research Pharms., Inc.*, No. 12-2170, 2013 U.S. Dist. LEXIS 107935, at *26 (E.D. Pa. Aug. 1, 2013) (citation omitted).

In the instant case, Plaintiff asserts that his impairment is back pain from Spondylolisthesis, and that this limits the major life activities of standing, walking, lifting, sitting on the ground, and running.[16]  (Pl. Resp. at 26).  Defendants contend that Plaintiff's back pain does not *substantially limit* Plaintiff in any way.

---

[16]  In his Response, Plaintiff identified his areas of impairment as walking, sitting and standing.  (Pl. Resp. at 25 (identifying walking, sitting and standing as the major life activities at issue)).

A review of the record reveals that while Plaintiff most likely does experience back pain, it has not limited him with regard to any major life activities.  Plaintiff had back fusion surgery in 2005, and was first diagnosed with Spondylolisthesis several years before that.  (Def. Appx. at 1 ("Dec. 22, 2005 Post-op visit Summary")).  Doctor's progress notes from seventeen days after the surgery reveal that Plaintiff had complete pain relief in his left leg and his x-rays showed "perfect position of the instrumentation.  His incision is well healed."[17]  (*Id.*).  In 2008, two years after his surgery, Plaintiff visited the doctor for "pain."  (Def. Appx. 2).  The progress notes from that visit state the following:

> The patient is 2 years after fusion.  He is at full activities and is currently employed as a pharmacist and he is on his feet most of the day.  He did not know whether he would be able to tolerate this activity, but currently he is happy with his progress.
> Physical examination reveals that gait is normal, affect is pleasant and cooperative.  His range of motion does not produce pain and he is not tender.
> Lower extremity examination reveals strength is normal, reflexes are normal and straight leg raise is negative.

(Def. Appx. at 2).  On January 15, 2010–about three months after his termination from Elwyn–Progress notes indicate that Plaintiff was having "increased pain" from having to stand more for his job.  (Pl. Ex. D at 5).  However, on January 28, 2010, Dr. Pamela Gordon conducted a one-hour medical examination of Plaintiff and concluded that Plaintiff was able to do the essential functions of his job and had *no medical restrictions*.  (Def. Appx. at 22; *see also* Palish

---

[17]   The determination of whether one is disabled focuses on the time of the adverse employment action.  However, the notes after his surgery are relevant because they show the progress of his impairment in the years leading up to the period in question.  The notes also assist in determining if Plaintiff's impairment is transitory or permanent.

Dep. at 133).

Plaintiff testified that since his back surgery he has been able to lead an active lifestyle; he goes to gym twice a week where he swims and lifts weights.  He also bikes once a week during the summer, and plays tennis occasionally.  (Palish Dep. at 17-20).

In determining whether an impairment is substantially limiting, the Court should consider factors such as:  (1) the nature and severity of the impairment; (2) the length or expected duration of the impairment; and (3) the actual or expected permanent or long term impact of the impairment.  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (quoting 29 C.F.R. § 1630.2 (j)(2)).  Even viewing the evidence in the light most favorable to Plaintiff, none of these factors support a finding of disability under the ADAAA.

First, the deposition testimony of Plaintiff and the medical evidence show that Plaintiff's back pain has greatly improved since his surgery and has not limited his ability to lead an active lifestyle or do the "essential functions of his job."  (Palish Dep. at 133; Def. Appx. at 22). Second, there is no evidence as to the expected duration of Plaintiff's back pain, although the medical notes since his surgery generally do not show substantially limiting instances of pain. Indeed, there is only one medical document in which Plaintiff complained of back pain, and a majority of his progress notes indicate an absence of tenderness in the spine.  *See Poper v. SCA Americas., Inc.*, No. 10-3201, 2012 U.S. Dist. LEXIS 113653, at *24-25 (E.D. Pa. Aug. 13, 2012) (doctor's note reporting "general back pain" during emergency room visit and medical records showing absence of "c-spine tenderness" did not establish a disability under the ADAAA).

Our analysis of the third factor has been altered by the 2008 ADA Amendments Act,

which rejected the "permanent" and "long term" requirement embodied in the original Act and stated that "*episodic* or *in remission* fits within the definition of disability if it would substantially limit when active." (emphasis added).  Here, the proffered evidence fails to establish that Plaintiff was substantially limited in a major life activity even when he was experiencing back pain.  The only evidence that tends to support the conclusion that Plaintiff's back pain is limiting is his deposition statements.  Specifically, Plaintiff testified he must be cognizant of how much stress he puts on his back, and that being on his feet for long periods of time–whether it be standing or walking–will cause him pain.  (Palish Dep. at 247-48).  Importantly, Plaintiff also testified that he was able to do the amount of standing required by his position at Elwyn, but that it caused him pain.  (*Id.* at 125).  Finally, Plaintiff testified that he was prescribed pain medication for his back, but he did not normally take it and he could not determine how often he took it.  (*Id.* at 8).

Courts in this Circuit have noted that deposition statements, by themselves, cannot create a genuine issue of material fact in the face of contradictory medical evidence.  *See Rocco v. Gordon Food Serv.*, No. 11-585, 2014 U.S. Dist. LEXIS 16103, at *14 (W.D. Pa. Feb. 10, 2014) (plaintiff was not substantially limited when only evidence consisted of his deposition testimony that he experienced pain, and he was medically cleared to resume work); *Poper*, 2012 U.S. Dist. LEXIS 113653, at *24 (finding that the plaintiff's back pain did not constitute a disability when the only evidence that it substantially limited him was his deposition testimony and there was contradictory medical documentation).  Here, the medical evidence does not establish that Plaintiff was substantially limited; to the contrary, a medical exam done just a few months after his termination revealed that he was able to do the essential functions of his job and had no

14

medical restrictions.  *See Rocco*, 2014 U.S. Dist. LEXIS 16103, at *14 (the plaintiff failed to

establish that he was substantially limited when he medically cleared to resume work).  He

testified at deposition that being on his feet for long periods of time caused him pain, but it did

not substantially limit him in any major life activity.  Indeed, Plaintiff testified that he was able

to stand for the eight or so hours required during his shift.  *See McDonough v. Donahoe*, 673

F.3d 41, 48 (1st Cir. 2012) (Plaintiff's ability to stand for one hour a day and intermittently for

four hours a day meant that she was not substantially limited in her ability to stand); *see also*

*Whitlock v. Mac-Gray, Inc.,* 345 F.3d 44, 46 (1st Cir. 2003) (Plaintiff could now show that he

was disabled because he conceded that he could do his job despite his impairment).  Moreover,

Plaintiff's testimony regarding his active lifestyle undercuts his contention that he is

substantially limited in a major life activity.

    While Plaintiff correctly notes that Congress sought to relax the standard for the

"substantially limits" factor when it passed the ADAAA, he still must establish that his

impairment substantially limited a major life activity beyond just merely causing pain.  *Koller v.*

*Riley Piper Hollin & Colagreco*, 850 F. Supp. 2d 502 (E.D. Pa. 2012) ("although Congress

sought to relax the standard for the "substantially limits" factor, "the ADAAA still requires that

the qualifying impairment creates an important limitation").  As noted above, at most Plaintiff

can establish that he experienced some pain while standing, but he was not substantially limited

and was still able to stand for hours at a time.  (*See* Palish Dep. at 125).  It is well settled that an

individual who experiences pain is not disabled unless it substantially limits them in a major life

activity.  *See Marinelli v. City of Erie*, 216 F.3d 354 (3d Cir. 2000) ("pain that does not

substantially interfere with functionality does not rise to the level of a disability under the

ADA"); *Rocco v. Gordon Food Serv.*, 2014 U.S. Dist. LEXIS 16103, at *15 (fact that plaintiff

experienced pain when performing major life activity did not mean he was substantially limited);

*Emeric v. Norfolk S. Ry. Co.*, No. 03-266, 2006 U.S. Dist. LEXIS 89605 (E.D. Pa. Dec. 12,

2006); ("proof that he suffers from an ailment–even one with painful and disruptive

symptoms–is not proof that the ailment substantially limits a major life activity.").

Simply put, there is no evidence in the record that would allow a reasonable juror to

conclude that Plaintiff's back pain *substantially limits* him in a major life activity.  Accordingly,

because Plaintiff cannot establish that he was disabled under the relevant meaning of the

ADAAA, Defendants' motion as to Plaintiff's failure to accommodate claim is GRANTED.[18]

### B       Claims 2 and 3: Discrimination and Retaliation

Plaintiff claims he was terminated on the basis of his disability (Claim 2) and in

retaliation for requesting a reasonable accommodation (Claim 3).  As noted above, Claims 2 and

3 both utilize the burden-shifting framework announced in *McDonnell Douglas*, 411 U.S. 792.[19]

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden to show a prima

facie case of discrimination; the burden then shifts to the defendant to offer a legitimate, non-

---

[18]  The ADAAA substantially lowered the ADA's standard for disability, but the PHRA's standard has not changed.  However, because Plaintiff cannot establish that he is disabled under the broader ADAAA standard, he necessarily cannot establish disability under the PHRA.  *See Rocco*, 2014 U.S. Dist. LEXIS 16103, at *15; *cf. McFadden v. Biomedical Sys. Corp.*, No. 13-4487, 2014 U.S. Dist. LEXIS 2363, at *5 n.2 (E.D. Pa. Jan. 9, 2014).

[19]  Plaintiff argues that the *McDonnell Douglas* framework is not applicable because he has pointed to direct evidence of discrimination and retaliation.  Specifically, Plaintiff argues that Dr. Seiden's statement that "if [Plaintiff] needed to sit down, he probably wouldn't work out for this position" constitutes direct evidence of retaliation.  However, this statement was made at the beginning of Plaintiff's employment and an inference must be drawn based on temporal proximity to conclude that he was fired because of discrimination or his request for an accommodation.  Thus, this statement does not constitute direct evidence.

discriminatory reason for the employment actions; and finally, the burden shifts back to the plaintiff to prove that the offered reason is pretextual.  *Id.* at 500-01.

### 1.        Claim 2: Prima Facie Case of Discrimination

A *prima facie* case of disability discrimination requires that the plaintiff successfully show that: (i) he is disabled within the meaning of the ADA; (ii) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (iii) he was subject to some adverse action as a result of his disability.  *Gand v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  Since Defendants only contest the first two elements, this Court will confine our analysis to whether Plaintiff is disabled and otherwise qualified.[20]

### a.        "Regarded as" Disabled

As noted above in the discussion of Claim 1, Plaintiff has not met his summary judgment burden of establishing that he is actually disabled.  However, that does not defeat Plaintiff's disparate treatment claim if he can show that he was "regarded as" disabled.  "'Regarded as' disability does not depend on the plaintiff having any impairment.  The question is not the plaintiff's actual condition, but rather [his] condition as perceived by [his] employer, including the reactions and perceptions of the persons interacting or working with [him]."  *Estate of Murray v. UHS of Fairmount, Inc.*, No. 10-2561, 2011 U.S. Dist. LEXIS 130199, at *26-27 (E.D. Pa. Nov. 10, 2011) (quoting *Kelley v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir. 1996)).  After the passage of the ADAAA, an employer no longer has to regard the plaintiff as having an

---

[20]  As to the third element, it is well settled that terminating ones employment constitutes an adverse action for purposes of the ADA.  *See* 42 U.S.C. § 12112(a) (the ADA prohibits discrimination against qualified individuals with a disability in regards to, *inter alia*, discharge).

impairment that substantially limits a major life activity.  *Id.*   Rather, a plaintiff can establish a genuine issue of fact for "regarded as" disability by showing that a decisionmaker knew of the impairment.  *See id.*; *Rubano v. Farrell Area Sch. Dist.*, No. 11-1574, 2014 U.S. Dist. LEXIS 1835, at *33 (W.D. Pa. Jan. 8, 2014) ("After the 2008 amendments to the ADA definition of disability, all that an ADA plaintiff must show to raise a genuine issue of material fact for the "regarded as" prong is that a supervisor knew of the purported disability.") (citations omitted).

Here, Dr. Seiden–who was Plaintiff's supervisor and involved in the decision to terminate him–testified that he was aware of Plaintiff's back pain and the fact he had spinal fusion surgery.  (*See* Seiden Dep. at 148-49).  Thus, because Dr. Seiden was aware of Plaintiff's back issues, I find that Plaintiff has met his summary judgment burden of establishing that he was "regarded as" disabled.  *See Mengal v. Reading Eagle Co.*, No. 11-6151, 2013 U.S. Dist. LEXIS 45300, at *14 (E.D.Pa. Mar. 29, 2013) (finding that the plaintiff had established he was regarded as disabled under the ADAAA by pointing to evidence that his supervisor was aware of his impairment and the problems that it caused).

### b.  Otherwise Qualified

As to the second element, "we determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (citation omitted).  Conversely, "the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext."  *Id.*

Here, Defendants contend that Plaintiff did not possess the following job qualifications: (1) knowledge of medications, dosage, and side effects; (2) the ability to train and supervise

assigned staff; (3) the "ability to work even in multiple demands;" and (4) the ability to maintain and promote a positive attitude towards job and company.  (Def. Repl. at 21).  All of these qualities are subjective qualifications that will not serve to defeat Plaintiff's prima facie case.[21]  Furthermore, Plaintiff has over twenty-five years experience as a pharmacist, a Doctorate of Pharmacy degree, and had previously held a position supervising at least one individual (Palish Dep at 75).  *See Sempier*, 45 F.3d at 729 (finding the district court erred by finding the plaintiff was not qualified because he lacked supervisory skills when he had over twenty years experience and had previously held positions as a supervisor).  Accordingly, I conclude that Plaintiff has created a genuine issue of material fact that would allow a reasonable juror to conclude that he was sufficiently qualified for the job from which he was terminated.[22]

### 2.   Claim 3: Prima Facie Case of Retaliation for Requesting a Reasonable Accommodation

Under the *McDonnell Douglas* framework, a prima facie case of retaliation requires the plaintiff to show: (1) engagement in a protected activity; (2) his employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link

---

[21]  Arguably, "knowledge of medications" is an objective qualification.  However, Plaintiff testified that the issue with his medication knowledge was largely due to the fact that his previous position identified drugs by their generic name, while at Elwyn drugs were identified by their brand name.  Taking the evidence in the light most favorable to Plaintiff, his extensive experience in pharmacy and the fact that he did have detailed knowledge of drug names (albeit in generic form) supports the inference that he had the requisite knowledge required for the position.

[22]  Additionally, the basis of Defendants' assertion is similar to their non-discriminatory reason for terminating Plaintiff.  Other courts in this Circuit have noted that the employer's alleged nondiscriminatory reason should not be considered when analyzing the prima facie case. *See Wilson v. N. Westmoreland Career & Tech. Ctr.*, No. 09-1492, 2011 U.S. Dist. LEXIS 19362, at *28 n.12 (W.D. Pa. Feb. 28, 2011) (citations omitted).

exists between the adverse action and the protected activity.  *Shellenberger v. Summit Bancorp*, *Inc.*, 318 F.3d 183, 187 (3d Cir. 2003)**.**  It is clear that Plaintiff can establish a prima facie case. Plaintiff's request for a reasonable accommodation constitutes protected activity.  *Fogleman v. Greater Hazleton Health Alliance*, 122 Fed. Appx. 581 (3d Cir. 2004).  As to the second and third elements, Plaintiff suffered an adverse action when he was terminated, and the temporal proximity (two weeks) between his protected activity and his termination is sufficient to establish the requisite causal link for purposes of the prima facie case.  *See Butler v. BTC Foods, Inc.*, No. 12-0492, 2014 U.S. Dist. LEXIS 11286, at *20 (E.D. Pa. Jan. 30, 2014).

### 3.    Defendants Legitimate Non-Discriminatory Reason

Once the plaintiff has established a prima facie case, the defendant has the burden of producing a legitimate non-discriminatory reason for the challenged employment action.  *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  This burden is "one of production not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  The burden of production is a light burden. The employer is not required to prove that their non-discriminatory reason actually motivated the decision, because the ultimate burden of proving intentional discrimination always rests with the plaintiff.  *See Khalil*, 2008 U.S. Dist. LEXIS 10169, at *53.

Defendants cite to the same legitimate non-discriminatory reason to meet their burden for Claims 2 and 3.  Specifically, Defendants contend that Plaintiff was terminated because of numerous performance issues during his fifteen days of employment.  These include: (1) his demonstrated lack of knowledge of certain aspects of the pharmacy; (2) his inability to supervise and lack of supervisory and leadership abilities; (3) the off-color comment he made to one of his

co-workers; and (4) the fact other employees generally felt uncomfortable working with him. I conclude that Defendants have articulated a legitimate non-discriminatory reason for terminating Plaintiff. *See, e.g.*, *Wooler v. Citizens Bank*, 274 F. App'x 177, 180 (3d Cir. 2008) (finding that poor performance is a legitimate, nondiscriminatory reason firing and employee); *Scully v. Allegheny Ludlum Corp.*, 257 F. App'x 535, 537 (3d Cir. 2007) (holding that discharge for performance reasons is a legitimate non-discriminatory reason).

### 4.    Pretext[23]

Once the defendant has proffered their legitimate non-discriminatory reason, the burden shifts back to the plaintiff to show that the defendants' proffered reason is pretextual. In order to survive summary judgment, the plaintiff must submit evidence sufficient for a factfinder to "either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997); *see also Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994). The plaintiff can discredit an employer's proffered reason by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action." *Fuentes*, 32 F.3d at 765.

To support his burden, Plaintiff cites to the following facts: (1) Dr. Seiden's statement at the time of termination that he should have hired somebody younger and more energetic; (2) the

---

[23] Because both parties utilize the same arguments for and against pretext as to both Claims 2 and 3, this Court's pretext determination will apply equally to both claims. *See Socoloski v. Sears Holding Corp.*, No. 11-3508, 2012 U.S. Dist. LEXIS 108859, at *15 (E.D. Pa. Aug. 3, 2012) (analyzing pretext for ADA discrimination and retaliation claims together); *Estate of Murray*, 2011 U.S. Dist. LEXIS 130199, at *32 (same).

fact he was terminated two weeks after requesting that he be allowed to sit; (3) Defendants

refusal to accommodate his request to sit; (4) Dr. Seiden's comment that if he had to sit for his

entire shift it would be an issue; (5) the lack of documents reflecting Plaintiff's poor job

performance; (6) Defendants failure to discipline Plaintiff pursuant to their disciplinary policy;

(7) Defendants treated similarly situated individuals who did not request a reasonable

accommodation differently; and (8) Defendants' contradictory statements about who made the

termination decision.  (Pl. Resp. at 33-35).

       To begin, the evidence establishing a causal connection between Plaintiff's termination

and his request for a reasonable accommodation, although sufficient for purposes of a prima

facie case, is attenuated at best.  *See Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir.

2008) (evidence supporting the prima facie case is often important in the pretext stage).  The

summary judgment record shows that Plaintiff informed Dr. Seiden of his back issues and asked

if he could occasionally sit on September 27, 2012, his first day of employment.  Dr. Seiden

considered Plaintiff's request and ultimately denied it the next day, allegedly telling Plaintiff that

if he needed to sit "he probably wouldn't work out for this position."  (Palish Dep. at 109-110).

Plaintiff was terminated around two weeks later.   While such temporal proximity may be

sufficient to establish a prima facie case, it does not suffice to meet Plaintiff's ultimate burden of

proving pretext.  *See Ballard v. Mercy Catholic Med. Ctr.*, No. 12-0779, 2013 U.S. Dist. LEXIS

92108, at *33 (E.D. Pa. June 28, 2013) (temporal proximity sufficed to establish causation for

purposes of the prima facie case but did not suffice to show pretext at the final stage of the

burden-shifting test); *Verma v. Univ. of Pa.*, No. 11-611, 2012 U.S. Dist. LEXIS 70333, at *33

(E.D. Pa. May 18, 2012) ("Mere temporal proximity, absent any evidence of retaliatory intent, is

insufficient to demonstrate <u>pretext</u>").

Notably, the events that immediately followed Plaintiff's request for an accommodation are devoid of any evidence indicating discriminatory or retaliatory animus.  For the first week of his employment, Plaintiff was permitted to shadow Dr. Seiden and was trained by him.  On October 8, 2012–eleven days after his request to sit–Dr. Seiden met with Plaintiff to go over an "action plan" in order to help Plaintiff improve on certain areas he had been having difficulty with; Plaintiff was receptive to that plan.  (Seiden Dep. at 114).  The next day, Plaintiff failed to show initiative at a flu clinic and did not know how to properly vaccinate people despite having a license to do so.  (*Id.* at 131).  Three days later, Dr. Seiden and James Karalis met with Plaintiff and terminated his employment, with Dr. Seiden allegedly telling him "I should have hired somebody younger and more energetic."  (Palish Dep. at 185).

Plaintiff argues that Defendants permitted similarly situated individuals who were not disabled and did not request an accommodation to remedy their performance issues, but did not give that same opportunity to Plaintiff.  Evidence that similarly situated employees (also known as "comparators") who did not request an accommodation and were treated more favorably than Plaintiff may establish pretext.  *See Socoloski*, 2012 U.S. Dist. LEXIS 108859, at *15 (conducting comparator analysis in ADA retaliation claim)  The determination of whether one is similarly situated focuses on the particular criteria or qualifications identified by the employer as the reason for the adverse action.  *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998).  "A similarly situated employee does not need to be identically situated, but the comparator must be similar to plaintiff in all relevant respects."  *Abdul-Latif v. County of Lancaster*, No. 12-948, 2014 U.S. Dist. LEXIS 1313, at *10 (E.D. Pa. Jan. 7, 2014) (citing *Wilcher v. Postmaster Gen.*,

441 F. App'x 879, 881-82 (3d Cir. 2011)).  Relevant factors include "whether the employees

dealt with the same supervisor, were subject to the same standards, shared similar job

responsibilities and the nature of the misconduct."  *Id.* at *11.  For purposes of the instant

motion, Plaintiff must establish a genuine issue of fact as to whether the identified individuals

are similarly situated; in other words, summary judgment is appropriate on the issue of whether

an individual is a comparator only "when there is no evidence from which a jury could conclude

the parties were similarly situated."  *Id.*

      Here, Plaintiff contends that two other managers (Lisa Ziogas and Paula Kessler) had

managerial issues similar to his but were not terminated; instead they were given time to

improve upon their deficiencies and both continue to work at Elwyn.  I conclude, for present

purposes, that Paula Kessler is a valid comparator.[24]  Considering the factors noted above, Ms.

Kessler had the same supervisor (Dr. Seiden) and held the same position as Plaintiff (Pharmacy

Manager), thus it is reasonable to infer that she had the same responsibilities.  (*See* Seiden Dep.

at 119).  The record does not give specific details on the nature of Ms. Kessler's performance

issues.  However, Dr. Seiden testified he confronted her because he was not satisfied with her

managerial skills, which was the primary reason he gave for terminating Plaintiff.[25]  (Seiden

Dep. at 119).  Thus, taking all evidence in the light most favorable to Plaintiff, there is sufficient

---

[24]  Lisa Ziogas was a customer service manager at a different location.  (Seiden Dep. at
117).  Therefore, she is not a valid comparator because she did not hold the same position as
Plaintiff.  *See Wilcher*, 441 F. App'x at 881 (finding employees who did not hold same position
as the plaintiff were not "similarly situated").

[25]  There is no evidence in the record that other employees lodged complaints about Ms.
Kessler.  At this stage however, the fact that Dr. Seiden had issues with the managerial skills of
both Plaintiff and Ms. Kessler is sufficient to tilt this factor in favor of finding the two similarly
situated.

evidence from which a reasonable jury could conclude that Ms. Kessler was similarly situated to Plaintiff. [26]

Having found, for purposes of this motion, that Ms. Kessler was similarly situated to Plaintiff, I also conclude that there is sufficient evidence to allow a reasonable juror to conclude that she was treated more favorably.  Like Plaintiff, Ms. Kessler was approached by Dr. Seiden when she was a "new manager" because he was not satisfied with her managerial skills.  (Seiden Dep. at 119).  Also, like Plaintiff, Ms. Kessler was provided with a list of skills that she needed to improve upon.[27]  (*Id.* at 120).  Unlike Plaintiff, Ms. Kessler did not request a reasonable accommodation, and has not been terminated.  (*Id.* at 121).  While the fact that one comparator received more favorable treatment does not, by itself, establish pretext, *Ray v. Pinnacle Health Hospitals, Inc.*, 416 F. App'x 157, 164 (3d Cir. 2010), it does provide a basis for a jury to disbelieve Defendants' non-discriminatory reason.

In sum, Plaintiff's arguments in support of pretext are relatively weak, and there is scant evidence that Plaintiff's back issues and request for a reasonable accommodation played much, if any, role in the decision to terminate Plaintiff.  However, the fact that Plaintiff requested a reasonable accommodation and was then fired two weeks later while another manager who did

_____

[26]  In their Reply, Defendants argue that Plaintiff's cited employees are not similarly situated because they had different job titles, received discipline for different misconduct, and were employed significantly longer than Dr. Palish.  (Def. Reply at 18 n.63).  However, Defendants do not go into further detail or point to facts in the record to support their contention. Furthermore, this Court's own review of the relevant portions of the record does not support Defendants' argument.

[27]  The list that Ms. Kessler was provided did not contain deadlines for improvement as Plaintiff's did.  However, this difference will not render her an invalid comparator for purposes of this motion.

not request an accommodation was given an opportunity to improve her performance (and was not terminated) might permit a reasonable factfinder to conclude that Defendants' proffered reasons were pretextual.  *See Socoloski*, 2012 U.S. Dist. LEXIS 108859, at *15 (finding pretext where, *inter alia*, one comparator who was not disabled was treated differently).  Because I must draw all reasonable inferences in the light most favorable to Plaintiff, I conclude that he has met his burden at step three; Defendants motion as to Plaintiff's ADA disparate treatment and retaliation claim will be DENIED.

## V.      AGE DISCRIMINATION IN VIOLATION OF THE ADEA

Plaintiff also claims he was terminated because of his age, in violation of the ADEA. ADEA claims are also analyzed pursuant to the *McDonnell Douglas* burden-shifting analysis. To establish a prima facie case of age discrimination, the plaintiff must present evidence that (1) the plaintiff was 40 years of age or older, (2) the plaintiff was terminated, (3) the plaintiff was qualified for the job from which he was terminated, (4) the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination.  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (citations omitted).

Defendants dispute only the third and fourth elements.  (*See* Def. Repl. at 21).   As to the third element, I have already determined that, for present purposes, Plaintiff has met his burden of establishing that he was objectively qualified for the job.  *See supra* p. 17.

As to the fourth element, Plaintiff must show that his replacement was "sufficiently younger to permit an inference of age discrimination."  *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 698 (3d Cir. 1995) (internal quotations omitted).  Plaintiff was fifty-three years old at

the time he was terminated and his replacement was thirty-one years old.  It is well settled that a

twenty-plus year age difference is more than sufficient to permit an inference of age

discrimination.  *See id.* at 699 (eight year age difference permitted inference of age

discrimination); *Maxfield v. Sinclair*, 766 F.2d 788, 793 (3d Cir. 1985) ("[the plaintiff's]

replacement by an employee more than 20 years younger was sufficient" to establish an

inference of age discrimination).  Accordingly, I conclude that Plaintiff has met his burden of

establishing a prima facie case of age discrimination.

The burden now shifts to Defendants to articulate a legitimate non-discriminatory reason

for terminating Plaintiff.  Defendants set forth the same reasons that were discussed above in

relation to Plaintiff's ADAAA claim, that is: Plaintiff was terminated because of:  (1) his

demonstrated lack of knowledge of certain aspects of the pharmacy; (2) his inability to supervise

and lack of supervisory and leadership abilities; (3) the off-color comment he made to one of his

co-workers, and (4) the fact other employees generally felt uncomfortable working with him.  As

noted above, Defendants have met their summary judgment burden of articulating a legitimate

non-discriminatory reason for terminating Plaintiff.

Since Defendants have satisfied their burden of articulation, it is incumbent upon

Plaintiff to create a genuine issue that Defendants' explanation was a pretext for age

discrimination.  While Plaintiff puts forth essentially the same evidence that he used to show

pretext in his ADA claim, his argument is arguably even stronger in the ADEA context.  *Cf.*

*Walton*, 168 F.3d 661 at 666 (facts used to prove ADA claim can be used interchangeably with

ADEA claim).  Specifically, Plaintiff points to a statement made by Dr. Seiden at the time of his

termination, when he told Plaintiff that "he should have hired somebody younger and more

energetic."  (Palish Dep. At 185).  It is well settled that age-related comments made by those involved in the decision to terminate an employee are probative of a discriminatory attitude.[28]  *Deangelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 382 (E.D. Pa. 2010) (citing *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214-15 (3d Cir. 1995)).  "In cases where employees offer discriminatory comments in order to show pretext, it is important to consider the relationship between the speaker and the employee, the timing of the comment, and the purpose and content of the statement."  *Id.* (citing *Grantz v. Gerguson Enters., Inc.*, No. 07-4083, 2009 U.S. Dist. LEXIS 6241 (E.D. Pa. Jan. 28, 2009)).   Here, the fact that the comment was said by a person involved in the decision to terminate Plaintiff, at the <u>time</u> he was terminated, for purposes of explaining <u>why</u> Plaintiff was terminated, provide evidence from which a jury might conclude that Defendants' proffered reasons for termination were a pretext for age.[29]  *See id.* (fact age-related comment was made near actual termination allowed an inference that age was "but for" cause of termination).

       While both Dr. Seiden and James Karalis deny that Dr. Seiden made such a comment, the determination of whether the comment was made is a credibility determination that must be left

---

[28]  The probative portion of Dr. Seiden's statement is seemingly limited to his contention that he should have hired somebody "younger," as the reference to hiring somebody more "energetic" has been deemed age-neutral.  *See Thrower v. Home Depot, Inc.*, No. 04-577, 2005 U.S. Dist. LEXIS 21389 (W.D. Pa. Sept. 27, 2005) (statement that plaintiff lacked "energy" was age neutral did not support finding of pretext).

[29]  The parties dispute whether Dr. Seiden actually made the ultimate decision to terminate Plaintiff.  However, it is undisputed that Dr. Seiden at least had some input on the decision to terminate Plaintiff.  Accordingly, his age-related comment at the time of Plaintiff's termination can establish pretext under a "subordinate-bias" theory.  *See Socoloski*, 2012 U.S. Dist. LEXIS 108859, at *16-17 ("an employees termination can be tainted as discriminatory if an individual who contributes to the decision to terminate the employee possesses discriminatory animus, even if that individual does not make the ultimate employment decision").

to the jury.  For purposes of this motion, I must take the evidence in the light most favorable to Plaintiff and, as such, I must assume that the comment was made.  Consequently, the fact that Dr. Seiden directly referenced age as a reason for terminating Plaintiff, and then actually replaced Plaintiff with somebody over twenty years younger, is sufficient evidence to permit a reasonable juror to conclude that age discrimination was a "but for" cause of Plaintiff's termination.  Therefore, Summary Judgment on Plaintiff's ADEA claim is DENIED.

## VI.    CONCLUSION

Questions of material fact exist, thus rendering summary judgment inappropriate on Plaintiff's ADAAA disparate treatment and retaliation claims as well as his ADEA claim.  However, because Plaintiff has failed to meet his summary judgment burden to come forward with evidence that he was actually disabled, his failure to accommodate claim fails as a matter of law.  Thus, Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski                                   

LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

29